LEIF M. JOHNSON
United States Attorney
MARK S. SMITH
Assistant United States Attorney
2601 Second Avenue North, Box 3200
Billings, Montana 59101
Phone: (406) 247-4630
Email: MSmith4@usa.doj.gov

MARK C. ELMER
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Phone: (303) 844-1352
Email: Mark.Elmer@usdoj.gov

*Attorneys for Plaintiff United States of America*

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
Billings Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>BRIDGER PIPELINE LLC,<br><br>Defendant. | Case No. 22-cv-00043-BLG-SPW<br><br><br>**AMENDED COMPLAINT** |

The United States of America ("United States"), by the authority of the

Attorney General of the United States, and on behalf of the United States

Environmental Protection Agency ("EPA") and the United States Department of

Transportation, Pipeline and Hazardous Materials Safety Administration

("PHMSA"), files this complaint and alleges as follows:

## NATURE OF ACTION

1.     This is a civil action against Bridger Pipeline LLC ("Bridger" or

"Defendant").

2.     Defendant owns and operates hundreds of miles of buried pipelines

that gather and transport crude oil in Montana, North Dakota, and Wyoming.

3.     On January 17, 2015, one of those pipelines ruptured where it crosses

the Yellowstone River, resulting in the discharge of approximately 1,257 barrels of

crude oil into the Yellowstone River near Glendive, Montana (the "Yellowstone

Spill"), in violation of the Clean Water Act ("CWA") and regulations promulgated

pursuant to the Pipeline Safety Act ("PSA") (referred to herein as the "Federal

Pipeline Safety Regulations").

4.     The United States seeks injunctive relief, civil penalties, and punitive

damages for Defendant's violations of the Clean Water Act and the Federal

Pipeline Safety Regulations pursuant to, respectively, Sections 309 and 311 of the

CWA, 33 U.S.C. §§ 1319 and 1321, and Section 60120 of the PSA, 49 U.S.C. § 60120.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 309(b), 311(b)(7)(E), and 311(n) of the CWA, 33 U.S.C. §§ 1319(b), 1321(b)(7)(E), and 1321(n); Section 60120(a)(1) of the PSA, 49 U.S.C. § 60120(a)(1); and 28 U.S.C. §§ 1331, 1345, and 1355.

6.     Venue is proper in this District pursuant to Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E); Section 60120(a)(1) of the PSA, 49 U.S.C. § 60120(a)(1); and 28 U.S.C. §§ 1391 and 1395, because the violations that are the subject of this action occurred in this District, and Defendant is located and does business in this District.

7.     Authority to bring the United States' claims is vested in the United States Department of Justice by Section 506 of the CWA, 33 U.S.C. § 1366; Section 60120 of the PSA, 49 U.S.C. § 60120; and 28 U.S.C. §§ 516 and 519.

8.     Notice of commencement of this action has been provided to the State of Montana in accordance with Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## DEFENDANT

9.     Bridger is a Wyoming limited liability company.

10.     Bridger owns and operates the Poplar Pipeline, which gathers and transports crude oil from the Williston Basin in eastern Montana and North Dakota to Baker, Montana.

11.     Bridger is a "person" within the meaning of Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and Section 60101(a)(17) of the PSA, 49 U.S.C. § 60101(a)(17).

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

### Clean Water Act

12.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant, including oil, by any person, except as authorized by and in compliance with other sections of the Act. 33 U.S.C. § 1311(a).

13.     The Clean Water Act authorizes the United States to "commence a civil action for appropriate relief, including a permanent or temporary injunction," for violations of Section 301 of the Act. 33 U.S.C. § 1319(b).

14.     Another section of the Clean Water Act, Section 311(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States and adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States. 33 U.S.C. § 1321(b)(3).

15.     The President, through a delegation to EPA, has determined that quantities of oil that may be harmful, for purposes of Section 311, include discharges that (a) violate applicable water quality standards or (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines. 40 C.F.R. § 110.3.

16.     Anyone violating Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), is subject to a civil penalty. The penalty for a spill in January 2015 (when the Yellowstone Spill occurred) is up to $5,300 per barrel of oil discharged where the violation was the result of gross negligence or willful misconduct, and up to $2,100 per barrel in other cases. 33 U.S.C. § 1321(b)(7)(A) and (D); 40 C.F.R. § 19.4.

**Federal Pipeline Safety Regulations**

17.     Pursuant to Section 60102(a) of the PSA, PHMSA has promulgated regulations prescribing, among other things, minimum safety standards for pipeline operation and maintenance. 49 U.S.C. § 60102(a).

18.     As relevant here, these regulations are codified at 49 C.F.R. Part 195 (the "Federal Pipeline Safety Regulations").

19.     The Federal Pipeline Safety Regulations contain requirements that apply to operators of hazardous liquid pipelines that could affect a "high consequence area." 49 C.F.R. § 195.452.

20.     The Federal Pipeline Safety Regulations define "high consequence area" ("HCA") to include an "unusually sensitive area." 49 C.F.R. § 195.450. An unusually sensitive area, in turn, is defined as "a drinking water or ecological resource area that is unusually sensitive to environmental damage from a hazardous liquid pipeline release." 49 C.F.R. § 195.6.

21.     The Federal Pipeline Safety Regulations define drinking water and ecological resources, for purposes of identifying unusually sensitive areas. A drinking water resource is defined to include the water intake for a "community water system" and the "source water protection area" for a community water system. 49 C.F.R. § 195.6(a). An ecological resource is defined to include an area containing a critically-imperiled species or an imperiled, threatened, or endangered species that is aquatic, aquatic dependent, or terrestrial with a limited range. 49 C.F.R. § 195.6(b)(1) and (4).

22.     The Federal Pipeline Safety Regulations require operators of pipelines that could affect a "high consequence area" to develop and implement a written integrity management program ("IMP"). 49 C.F.R. § 195.452(b).

23.     This IMP must assess and address the risks to the integrity of each segment of pipeline, following "recognized industry practices," unless otherwise specified in 49 C.F.R. § 195.452 or the "operator demonstrates that an alternative practice is supported by a reliable engineering evaluation and provides an

equivalent level of public safety and environmental protection." 49 C.F.R. §

195.452(b).

24.     In assessing the risks to the integrity of each pipeline segment, the

operator must consider, among other things, "[l]ocal environmental factors that

could affect the pipeline," such as subsidence (i.e. the gradual caving in or sinking

of an area of land), "geo-technical hazards," and "[p]otential natural forces

inherent in the area (flood zones, earthquakes, subsidence areas, etc.)." 49 C.F.R. §

195.452(e) and 49 C.F.R. Part 195, Appendix C § I.B(12).

25.     An operator "must continually change the [IMP] to reflect operating

experience, conclusions drawn from results of the integrity assessments, and other

maintenance and surveillance data." 49 C.F.R. § 195.452(f). The IMP must

include, among other things, a "continual process of assessment and evaluation to

maintain a pipeline's integrity," "[i]dentification of preventative and mitigative

measures to protect the high consequence area," and a "process for review of

integrity assessment results and information analysis by a person qualified to

evaluate the results and information." 49 C.F.R. § 195.452(f)(5), (6), and (8).

26.     The operator must also "take measures to prevent and mitigate the

consequences of a pipeline failure that could affect a high consequence area,"

including "conducting a risk analysis of the pipeline segment to identify additional

actions to enhance public safety or environmental protection." 49 C.F.R. §

195.452(i)(1).

27.     The United States may bring an action to enforce the Federal Pipeline

Safety Regulations. 49 U.S.C. § 60120(a)(1). In such an action, the Court may

award appropriate relief, including a temporary or permanent injunction, punitive

damages, and civil penalties. Id.

## GENERAL ALLEGATIONS

### Poplar Pipeline

28.     The Poplar Pipeline is 10 to 12-inches in diameter and approximately

193 miles long. It transports crude oil from the Williston Basin south to Baker,

Montana, where it connects with the Butte Pipeline system.

29.     The Poplar Pipeline crosses under the Yellowstone River about six

river miles upstream from the city of Glendive, Montana (the "Yellowstone

Crossing").

30.     The Yellowstone River is the sole source of drinking water for the city

of Glendive.

31.     The reach of the Yellowstone River that includes the Yellowstone

Crossing contains pallid sturgeon, an endangered species of fish that is protected

under the Endangered Species Act of 1973.

32.     The Poplar Pipeline has the capacity to transport 42,000 barrels of crude oil per day. At the Yellowstone Crossing, the line is 12-inches in diameter. According to Bridger, in the 30 days prior to the Yellowstone Spill, an average of 36,000 barrels of crude oil per day passed through the Poplar Pipeline at the Yellowstone Crossing.

33.     The Yellowstone Crossing was completed in 1967 using the "open-cut method," which involves digging a trench across the bottom of the river channel, laying the pipeline in the trench, and then backfilling the trench with material from the excavation.

34.     The river bottom at the Yellowstone Crossing is comprised of medium-fine to medium-grained sand alluvium. The alluvium is underlain with Pierre Shale and easily moved in high flow conditions. The Pierre Shale is susceptible to river scour (i.e. the erosion of a river bed).

35.     At all relevant times, the Poplar Pipeline, at the Yellowstone Crossing, could affect a High Consequence Area ("HCA"), as that term is defined in 49 C.F.R. § 195.450.

36.     At the time of the Yellowstone Spill, the Poplar Pipeline, at the Yellowstone Crossing, was included in the written Integrity Management Plan developed by Bridger to comply with 49 C.F.R. § 195.452.

37.     Bridger has owned and operated the Poplar Pipeline since 2003.

## 2011 Silvertip Pipeline Spill

38.     In the summer of 2011, the Yellowstone River flooded, scouring the river bottom and exposing ExxonMobil's Silvertip Pipeline where it crosses the Yellowstone River near Laurel, Montana. The exposed pipeline failed in the currents, resulting in the discharge of more than 1,500 barrels of oil (the "Silvertip Pipeline spill").

39.     ExxonMobil's Silvertip Pipeline, like the Poplar Pipeline prior to the Yellowstone Spill, was installed under the Yellowstone River using the open-cut method.

40.     Following the Silvertip Pipeline spill, PHMSA advised all pipeline operators, including Bridger, to take steps to prevent and mitigate the risks associated with flooding and scouring. PHMSA expressly urged operators to perform surveys to determine the depth of cover at water crossings and to determine, when floodwaters recede, if flooding has exposed or undermined the pipeline "as a result of new river channels cut by the flooding or by erosion or scouring." 76 Fed. Reg. 44985, 44986 (July 27, 2011).

41.     Bridger was thus on notice no later than July 27, 2011 that flooding and scouring posed a risk to the integrity of the Poplar Pipeline at the Yellowstone Crossing.

42.     In September 2011 and April 2012, Bridger conducted depth of cover surveys at the Yellowstone Crossing. According to these surveys, there were places where the Poplar Pipeline was less than eight feet below the bottom of the river channel (i.e. less than eight feet of cover).

43.     In September 2012, the Yellowstone River Conservation District Council published a report to inform pipeline operators and others about certain risks to pipelines that cross the Yellowstone River, including "short term scour during flooding events," which the report described as "difficult to identify as it is typically not visible during low flows." Yellowstone River Pipeline Risk Assessment and Floodplain Reclamation Planning Project, Final Report, September 21, 2012 ("Yellowstone Report") at 1, 7.

44.     While the authors of the Yellowstone Report were unable to do a complete risk assessment, due to a lack of certain information, including channel geometry, depth of cover, and pipeline configurations, they determined that the Yellowstone Crossing was at moderate risk of failure due to erodible banklines. Id. at 26.

45.     The authors of the Yellowstone Report noted that flood and erosion controls, including riprap, "can exacerbate the potential for exposure of shallowly buried pipelines by concentrating erosive forces." Id. at 52.

46.    At the time of the Yellowstone Spill, there was riprap along the left (west) bank of the Yellowstone River at or near the Yellowstone Crossing.

47.    The authors of the Yellowstone Report further noted that the limited data they had concerning pipeline cover depths "indicates that many of the pipelines are buried less than eight feet below the channel bottom. These pipelines are at risk of exposure during flooding events." Id. at 53.

48.    Bridger knew or should have known before the Yellowstone Spill that the Poplar Pipeline at the Yellowstone Crossing was, in places, buried less than eight feet below the river bottom.

49.    During some winters, the Yellowstone River freezes, creating blocks of ice that form "ice jams." Ice jams are common on the Yellowstone River, especially in the vicinity of Glendive, Montana.

50.    A March 2014 ice jam event raised the level of the Yellowstone River by eight feet at Glendive, Montana, resulting in the loss of power to 30 homes and the evacuation of a trailer park.

51.    Ice jams can both increase the velocity of underwater currents and shift peak velocity closer to the river bottom, resulting in increased scour potential.

52.    Within several years after the Silvertip Pipeline spill, every other pipeline operator with a crossing on the Yellowstone River that had been installed using the open-cut method, except Bridger, implemented measures to address the

risks associated with scouring – either by armoring the crossing with rock or grout bags or re-installing the pipeline deeper under the river using the horizontal directional drilling ("HDD") method. The HDD method, which involves installing the pipeline through a drilled hole, allows a pipeline to be installed deeper than the open-cut method, and thereby below the area at risk of scouring.

53.     The use of HDD at water crossings is a recognized industry practice for addressing the risk to the integrity of a pipeline associated with river scour.

54.     Unlike all the other operators with crossings on the Yellowstone River, Bridger failed to take any measures to prevent and mitigate the risks associated with flooding and river scour at the Yellowstone Crossing, beyond doing the two depth of cover surveys in 2011 and 2012.

55.     Upon information and belief, material information in the 2011 and 2012 depth of cover surveys was false, misleading, or otherwise unreliable and Bridger either knew or should have known this.

## Yellowstone Spill

56.     Sometime on or before the morning of January 17, 2015, the Poplar Pipeline ruptured and began leaking oil at the Yellowstone Crossing.

**Impact of Yellowstone Spill**

57.     As a result of the Yellowstone Spill, oil was discharged into the Yellowstone River and onto the adjoining shorelines, causing sheens on the river for miles downstream from the Yellowstone Crossing that lasted for weeks.

58.     On January 18, 2015, an oil sheen was observed at the Glendive municipal water intake, which draws water directly from the Yellowstone River. A sample taken from Glendive's municipal water treatment plant contained benzene, a known human carcinogen, at a level of 14 parts per billion ("ppb"), nearly three times the maximum contaminant level of 5 ppb. 40 C.F.R. § 141.61(a).

59.     On January 18, 2015, Dawson County officials issued a "Do Not Drink" advisory and began distributing bottled water to Glendive residents. The advisory remained in effect until January 23, 2015.

60.     On March 14, 2015, after the melting and break-up of winter ice, operators of Glendive's water treatment plant detected volatile organic compounds ("VOCs") as high as 200 ppb in the Yellowstone River associated with the freeing up of oil entrained in ice on the river, and again shut down the city's drinking water intake.

61.     Oil sheens on the Yellowstone River in the vicinity of and as a result of the Yellowstone Spill were documented until at least April 8, 2015.

**Cause of Yellowstone Spill**

62.     Following the spill, divers located and retrieved the ruptured pipe from the bottom of the river and observed that the riverbed covering the pipe had scoured away, leaving the pipeline unsupported and exposed to river currents. Once exposed, vortex-induced vibration ("VIV") and other dynamic loading caused the pipeline to crack and fail.

63.     The use of the open-cut method put the Poplar Pipeline at risk of failure due to river scour – particularly given the installation of riprap along the left bank of the river (which can increase river velocity), the frequency of ice jams in the area of the Yellowstone Crossing, and the geologic formation (Pierre Shale, which is susceptible to scour).

64.     Despite a risk that was known, or should have been known, Bridger failed to adequately assess the risk of scour at the Yellowstone Crossing, prior to the Yellowstone Spill.

65.     As a result of its failure to conduct an adequate risk analysis, Bridger failed to identify and take additional actions – such as installing its pipeline at the Yellowstone Crossing below potential scour depths using the HDD method – to prevent and mitigate the consequences of erosion and river scour that could expose the pipeline to excessive external loads.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Civil Penalties for Yellowstone Spill
### 33 U.S.C. § 1321(b)

66.     Paragraphs 1 through 65 are incorporated herein by reference.

67.     At all relevant times, Bridger has been the owner, operator, or person in charge of the Poplar Pipeline.

68.     The Poplar Pipeline is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10).

69.     On or about January 17, 2015, the Poplar Pipeline ruptured, spilling approximately 1,257 barrels of crude oil into the Yellowstone River.

70.     The Yellowstone River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

71.     The Yellowstone River is navigable-in-fact and an interstate water.

72.     The spilled crude oil caused a sheen on the Yellowstone River and discoloration of the adjoining shoreline, and/or violated applicable water quality standards. Thus, the discharge was in a quantity that "may be harmful" within the meaning of Section 311(b)(3) and (4) of the CWA, 33 U.S.C. § 1321(b)(3) and (4); 40 C.F.R. § 110.3.

73.     Bridger's discharge violated Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

74.     Accordingly, Bridger is liable for civil penalties of up to $2,100 per barrel discharged pursuant to Section 311(b)(7)(A) of the CWA, or, if it is proven that the violation was the result of gross negligence or willful misconduct, $5,300 per barrel discharged under Section 311(b)(7)(D) of the CWA. See 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Injunctive Relief under CWA Section 309(b)
### 33 U.S.C. § 1319(b)

75.     Paragraphs 1 through 65 are incorporated herein by reference.

76.     The crude oil that was spilled in connection with the Yellowstone Spill was a "pollutant," within the meaning of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

77.     The discharge of crude oil in connection with the Yellowstone Spill reached waters of the United States and constituted the "discharge of a pollutant," within the meaning of Sections 301(a) and 502(12) of the CWA, 33 U.S.C. §§ 1311(a), 1362(12).

78.     Bridger was not authorized by any permit to discharge the crude oil associated with the Yellowstone Spill to waters of the United States.

79.     The discharge of crude oil in connection with the Yellowstone Spill violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

80.     Accordingly, Bridger is liable for injunctive relief pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## THIRD CAUSE OF ACTION

**Civil Penalties, Punitive Damages, and Injunctive Relief under the Federal Pipeline Safety Regulations**
**(Failure to Take Measures to Prevent and Mitigate the Consequences of a Failure of the Poplar Pipeline at the Yellowstone Crossing)**
**49 C.F.R. § 195.452**

81.     Paragraphs 1 through 65 are incorporated herein by reference.

82.     Bridger is an "operator" of the Poplar Pipeline within the meaning of 49 C.F.R. § 195.2.

83.     The Poplar Pipeline transports "hazardous liquids" within the meaning of 49 C.F.R. § 195.2.

84.     The Poplar Pipeline, where it crosses the Yellowstone River, could affect a "high consequence area" ("HCA"), as that term is defined in 49 C.F.R. § 195.450.

85.     As the operator of a hazardous liquid pipeline that could affect a HCA, Bridger is subject to the requirements in 49 C.F.R. § 195.452 concerning pipeline integrity management.

86.     The reach of the Yellowstone River that includes the Yellowstone Crossing is known to flood and experience ice jams, both of which can result in episodic river scour and erosion.

87.    Bridger failed to take measures to prevent and mitigate the consequences of a failure of the Poplar Pipeline where it crosses the Yellowstone River from known geological risks, including flooding and river scour, prior to the Yellowstone Spill, in violation of 49 C.F.R. § 195.452(i).

88.    Pursuant to 49 U.S.C. § 60120(a)(1), Bridger is liable for injunctive relief, punitive damages, and civil penalties for its violation of 49 C.F.R. § 195.452(i).

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

1.    Assess a civil penalty against Bridger in connection with the Yellowstone Spill, pursuant to Section 311(b) of the CWA, 33 U.S.C. § 1321(b), in an amount to be determined by the Court;

2.    Order Bridger to take all necessary steps to prevent future discharges of oil into navigable waters;

3.    Assess a civil penalty and/or punitive damages pursuant to the PSA, 49 U.S.C. § 60120(a)(1), against Bridger for each violation of the applicable provisions of the PSA and the Federal Pipeline Safety Regulations;

4.    Award other injunctive relief against Bridger as appropriate; and

5.    Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice


/s/ Mark C. Elmer
MARK C. ELMER
United States Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1352
Fax: (303) 844-1350
Email: Mark.Elmer@usdoj.gov


LEIF M. JOHNSON
UNITED STATES ATTORNEY


MARK S. SMITH
Assistant United States Attorney
2601 Second Avenue North, Box 3200
Billings, Montana 59101
(406) 247-4630
MSmith4@usa.doj.gov

OF COUNSEL:

MARGARET J. ("PEGGY") LIVINGSTON
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202

ERIN HENDRIXSON
JOSEPH HAINLINE
Attorney-Advisors
Office of Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Ave. S.E.
Washington, DC 20590

*Attorneys for the United States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Amended Complaint to be served by email on May 23, 2022 on:


Jeffrey J. Oven
Pamela C. Garman
Neil G. Westesen
CROWLEY FLECK PLLP
joven@crowleyfleck.com
pgarman@crowleyfleck.com
nwestesen@crowleyfleck.com


Colin G. Harris
Laurence (Trip) DeMuth III
FAEGRE DRINKER BIDDLE & REATH LLP
colin.harris@faegredrinker.com
trip.demuth@faegredrinker.com

*Attorneys for Defendant Bridger Pipeline LLC*


<u>/s/ Mark C. Elmer</u>
U.S. Department of Justice