LEIF M. JOHNSON
United States Attorney
MARK S. SMITH
Assistant United States Attorney
2601 Second Avenue North, Box 3200
Billings, Montana 59101
Phone: (406) 247-4630
Email: MSmith4@usa.doj.gov

MARK C. ELMER
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Phone: (303) 844-1352
Email: Mark.Elmer@usdoj.gov

*Attorneys for Plaintiff United States of America*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### Billings Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:22-cv-00043-BLG-SPW |
| Plaintiff, | |
| | **UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER, TO STAY DISCOVERY, AND TO CONTINUE PRE-TRIAL DEADLINES [DN 21]** |
| v. | |
| BRIDGER PIPELINE LLC, | |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

EXECUTIVE SUMMARY ...................................................................................1

INTRODUCTION ..............................................................................................1

RESPONSE TO DEFENDANT'S FACTUAL BACKGROUND............................2

    Federal Government's Investigation ........................................................ 2
    Federal Settlement Negotiations.............................................................3
    State Settlement .....................................................................................4
    PHMSA's Corrective Action Order .........................................................5
    Federal Complaint .................................................................................6
    United States' Pending Discovery..........................................................7

LEGAL STANDARD..........................................................................................7

ARGUMENT .....................................................................................................9

I. Bridger Cannot Demonstrate Good Cause For Staying Discovery, As There Is No "Clear Possibility" That Its Forthcoming Motion To Dismiss Will Be Granted. .................................9

    A.  The First Cause of Action is Not Barred by Bridger's 2016 Settlement with the State of Montana........................................................................9

    B.  The Complaint Satisfies The Pleading Requirements In Rule 8 Of The Federal Rules Of Civil Procedure.................................................... 13

    C.  The Portion Of The Third Cause Of Action Seeking Civil Penalties And Punitive Damages Is Not Barred By The Statute Of Limitations Because Bridger's Violation Of The Federal Pipeline Safety Regulations Was A "Continuing Violation."...................... 15

II. The Government Should Be Allowed To Take Discovery On The Applicability Of The Equitable Tolling Doctrine..............................................................16

CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................13

*Baadsgaard v. Safeco Ins. Co. of Illinois,* No., 2020 WL 6273405 (D. Mont. Sept. 21, 2020)................................................................................................................7

*Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111 (9th Cir. 1996), *cert. denied*, 519 U.S. 1101 (1997).............................................................10

*Curtis v. Option One Mortg. Corp.,* No., 2010 WL 1729770 (E.D. Cal. Apr. 28, 2010)...................................................................................................................14

*ExxonMobil Pipeline Co. v. United States Dep't of Transportation*, 867 F.3d 564 (5th Cir. 2017) ....................................................................................................16

*Fauley v. Wash. Mut. Bank, FA*, 2014 WL 1217852 (D. Or. Mar. 21, 2014) .........14

*Fed. Election Comm'n v. Williams*, 104 F.3d 237 (9th Cir. 1996)...........................17

*GTE Wireless, Inc. v. Qualcomm, Inc.,* 192 F.R.D. 284 (S.D. Cal. 2000) ...............9

*McAbee v. City of Fort Payne*, 318 F.3d 1248 (11th Cir. 2003) ...................... 10, 11

*Mlejnecky v. Olympus Imaging Am., Inc.,* 2011 WL 489743 (E.D. Cal. Feb. 7, 2011)..................................................................................................................8

*Page v. Shumaker Mallory, LLP*, 2022 WL 1308286 (D. Nev. Apr. 29, 2022)........8

*Save Our Beaches & Bays v. City and Cty. of Honolulu*, 904 F. Supp. 1098 (D. Haw. 1994) .................................................................................................. 11, 12

*United States v. Citgo Petroleum Corp.,* 697 F. Supp. 2d 670 (W.D. La. 2010) ....14

*Walker v. Higher Edu. Loan Auth., No.,* 2022 WL 1460021 (E.D. Cal. May 9, 2022)..................................................................................................................8

*Waste Action Project v. Atlas Foundry & Mach. Co.*, 1998 WL 210846 (D. Wash. 1998)................................................................................................................11

*Wood v. McEwen,* 644 F.2d 797 (9th Cir. 1981) ....................................................7, 8

**Statutes**

33 U.S.C. § 1321 ...................................................................................................13

49 U.S.C. § 60109 ...............................................................................................15

49 U.S.C. § 60120 ...............................................................................................16

**Other Authorities**

Fed. R. Civ. P. 26(c)(1) ..........................................................................................7

49 C.F.R. § 190.233(a).............................................................................................5

## **TABLE OF EXHIBITS**

Exhibit 1    PHMSA's December 13, 2011 request for information
             (US_RFA000009-11)

Exhibit 2    Bridger's response to PHMSA's request for information
             (US_RFA000012-28)

Exhibit 3    2012 depth of cover survey report (US_RFA000029-33)

Exhibit 4    "New" 2011 depth of cover survey report (US_RFA000001-5)

Exhibit 5    June 2015 email string (BRIDGER00054397-54402)

Exhibit 6    CAO Documentation Report (without attachments)

Exhibit 7    Accident Report, dated August 1, 2016

Exhibit 8    Bridger's May 29, 2015 to EPA's March 26, 2015 request for
             information

## EXECUTIVE SUMMARY

Defendant Bridger Pipeline LLC ("Bridger") seeks a stay of all deadlines, including deadlines to respond to discovery, while it litigates a yet unfiled motion to dismiss. While the United States does not oppose deferring the Rule 26(f) conference and related deadlines pending this Court's decision on the motion to dismiss, it does oppose staying discovery because Bridger cannot meet the applicable good cause standard for a protective order where a potentially dispositive motion has been filed. That standard requires, among other things, that the Court be "convinced" that the dispositive motion will be granted, or at least find that there is a "clear possibility" it will be granted, and that the motion can be resolved without additional discovery.

## INTRODUCTION

This case involves a large spill from the Poplar Pipeline where it crosses the Yellowstone River upstream from Glendive, Montana. The spill resulted in the discharge of approximately 1,257 barrels of Bakken crude oil, causing sheens on the river for weeks, contaminating Glendive's drinking water, and forcing the city to issue a "do not drink" advisory and distribute bottled water. The spill was unquestionably a violation of the Clean Water Act ("CWA"), carrying a maximum penalty of more than $6.6 million if the violation was the result of gross negligence or willful misconduct.

1

The case is related to similar claims against a "sister" company, Belle Fourche Pipeline Company ("Belle Fourche"), arising from a large spill from the Bicentennial Pipeline in Billings County, North Dakota. The Poplar and Bicentennial Pipelines are operated from the same control room (in Casper, Wyoming) by the same controllers, and while the pipelines are owned by separate corporate entities, those entities have common officers and directors, share employees, and are under the common control of members of the True family.

Given the close relationship between the two companies, as well as the commonality of issues and witnesses, the Government initially filed claims relating to both spills in this action. There is no disputing that it would have been more efficient, and thus less expensive, to litigate both sets of claims in one action. Despite these benefits, defendants objected to including the claims against Belle Fourche, asserting lack of personal jurisdiction. To avoid this distraction, the United States amended the complaint to remove the claims against Belle Fourche and then immediately refiled those claims in a new action in North Dakota.

## **RESPONSE TO DEFENDANT'S FACTUAL BACKGROUND**

### **Federal Government's Investigation**

Following the spill from the Poplar Pipeline into the Yellowstone River (referred to herein as the Yellowstone spill), both EPA and the Pipeline Hazardous Materials and Safety Administration ("PHMSA") began investigations. These

investigations included a series of requests for information and documents, which eventually resulted in the production of "well over 55,000 pages of documents and electronically stored information." Bridger's Motion for Protective Order (ECF No. 22) (hereinafter "Bridger's Motion") at 8-9. Reviewing this information took substantial time and resources. Given the technical nature of some of the information, the Government retained subject matter experts to assist, which added to the time needed to review and understand the information provided by Bridger.

Before the investigation of the Yellowstone spill could be completed, a pipeline operated by Bridger's "sister" company, Belle Fourche, ruptured in North Dakota, spilling more than 14,400 barrels of Bakken crude oil over the course of several days. This added more time, while the agencies investigated the North Dakota spill and the relationship between the Yellowstone and North Dakota spills.

### Federal Settlement Negotiations

While Bridger spills much ink over the length of time between the Yellowstone spill and the filing of this case, for a good part of that time – from 2018 until the filing of the complaint – the Parties were engaged in efforts to resolve claims arising from both the Yellowstone and North Dakota spills.[1] Unfortunately, despite considerable effort on both sides, the parties were unable to

---

[1] As we all know too well, the COVID-19 global pandemic was ongoing during a significant portion of this period, undoubtedly impacting the pace of negotiations.

come to terms, and with the parties' tolling agreement set to expire, the United States filed this action.

### State Settlement

In 2016, while the federal investigation was continuing, Bridger agreed to a settlement with the state of Montana relating to the Yellowstone spill. The terms of this settlement are memorialized in an Administrative Order on Consent ("AOC"), attached as Exhibit E to Bridger's Motion (ECF No. 23-5).

As part of this settlement, Bridger agreed to pay a $200,000 cash penalty and implement one or more state "supplemental environmental projects," commonly called SEPs. ECF No. 23-5 at ¶ 59. It is doubtful the state had the benefit of the information and documentation that the federal Government was able to obtain during its investigation or access to the necessary expertise to scrutinize Bridger's technical claims and other contentions. It is clear now that the cash penalty did not even recover the economic benefit Bridger enjoyed as a result of its violations, a critical piece of any penalty aimed at deterrence.

More importantly, the state penalty was not assessed under a state law that is comparable to CWA Section 309(g), and only the payment of a penalty under a "comparable State law" could possibly bar subsequent federal action. *See* CWA Section 309(g)(6)(A)(iii), 33 U.S.C. § 1319 (g)(6)(A)(iii) (providing that any violation for which a penalty under a "comparable State law" has been assessed

4

and paid shall not be subject to a civil penalty action under CWA Section 311(b)).

## PHMSA's Corrective Action Order

Within days of the Yellowstone spill, PHMSA issued a Corrective Action Order ("CAO") to Bridger. A copy of this order is attached as Exhibit A to Bridger's Motion (ECF No. 23-1). Bridger emphasizes that PHMSA's CAO did not allege any violation of PHMSA's regulations, as if that reflected a determination that no such violations occurred. But that inference would be neither fair nor correct. CAOs are used by PHMSA to require corrective action. *See* 49 C.F.R. § 190.233(a) (authorizing PHMSA to require pipeline operators to take "corrective action" where PHMSA finds that a pipeline is hazardous to life, property, or the environment). This is distinct from an action to enforce PHMSA's regulations (for example, pursuant to Sections 60120 and 60122 of the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60120). Indeed, the CAO issued to Bridger following the Yellowstone spill clearly states that it does not foreclose future enforcement related to the spill:

> The actions required by this Corrective Action Order <u>are in addition to and do not waive any requirements that apply to [Bridger's] pipeline system under 49 C.F.R. Part 195</u>, under any other order issued to [Bridger] under authority of 49 U.S.C. 60101, *et seq.*, or under any other provision of Federal or State law.

ECF No. 23-1 (PHMSA CAO) at 11-12 (emphasis added).

**Federal Complaint**

This case is brought by the United States, on behalf of EPA and PHMSA, to enforce provisions of the Clean Water Act and the Pipeline Safety Act (and related regulations) intended to protect public health and safety and the environment. It includes three separate causes of action:

- The First Cause of Action alleges a violation of Section 311(b) of the Clean Water Act, 33 U.S.C. § 1321(b), which prohibits the discharge of oil into or upon the navigable waters of the United States and adjoining shorelines;

- The Second Cause of Action alleges a violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), which prohibits the discharge of any pollutant, including oil, except as authorized by other sections of the CWA; and

- The Third Cause of Action alleges violations of the federal pipeline safety regulations – 49 C.F.R. § 195.452(i) – which required Bridger to take measures to prevent and mitigate the consequences of a failure of the Poplar Pipeline at the Yellowstone Crossing.

Bridger represents that it plans to file a motion to dismiss all three causes of action, on the grounds that (1) the First Cause of Action is barred by CWA Section 309(g) (6)(A)(iii) as a result of Bridger's 2016 settlement with the state of Montana, (2) the Second Cause of Action and a portion of the Third seeking

injunctive relief as a remedy for Bridger's violations of the CWA and federal

pipeline safety regulations have not been adequately pled, and (3) the remaining

portions of the Third Cause of Action (i.e. for civil penalties and punitive damages)

are barred by the applicable five-year statute of limitations.

## United States' Pending Discovery

The United States has served interrogatories, requests for production of

documents, and requests for admission. Copies of this discovery are attached to

Bridger's Motion as Exhibits K, L, and M (ECF Nos. 23-11, 23-12, and 23-13). All

these requests seek information related to the Government's claims. Many are also

related to Bridger's possible concealment of material information concerning the

condition of the Yellowstone Crossing before the Yellowstone spill, a topic

relevant to the applicability of equitable tolling, as discussed below.

## <u>LEGAL STANDARD</u>

A court may issue a protective order that stays discovery pending resolution

of a potentially dispositive motion only upon a showing of "good cause." Fed. R.

Civ. P. 26(c)(1); *Wood v. McEwen,* 644 F.2d 797, 801 (9th Cir. 1981); *Baadsgaard*

*v. Safeco Ins. Co. of Illinois,* 2020 WL 6273405, at *2 (D. Mont. Sept. 21, 2020).

The Federal Rules of Civil Procedure "do not provide for blanket stays of

discovery when a potentially dispositive motion is pending," and district courts

disfavor such blanket stays. *Page v. Shumaker Mallory*, *LLP*, 2022 WL 1308286,

at *1 (D. Nev. Apr. 29, 2022); *Mlejnecky v. Olympus Imaging Am., Inc.,* 2011 WL 489743, at *6 (E.D. Cal. Feb. 7, 2011).

The Ninth Circuit has yet to announce a clear test for evaluating when good cause exists in these circumstances, but district courts, including the District of Montana, have held a court may stay discovery pending a decision on a dispositive motion if (1) the dispositive motion is potentially dispositive of the entire case, or at least dispositive of the issue at which discovery is aimed; (2) the court is "convinced" the dispositive motion will be granted or finds there is a "clear possibility" the dispositive motion will be granted; and (3) the dispositive motion can be decided without further discovery. *Baadsgaard,* 2020 WL 6273405, at *2 (citing *Mlejnecky,* 2011 WL 489743, at *6-8). While Bridger's Motion includes several additional factors, the three-prong test above should be the focus of the Court's analysis because Bridger cannot meet even this test. *See Baadsgaard,* 2020 WL 6273405, at *2 ("District courts in this Circuit have held that good cause <u>may</u> exist if the…three requirements are satisfied.") (emphasis added); *Walker v. Higher Edu. Loan Auth.,* 2022 WL 1460021, at *3 (E.D. Cal. May 9, 2022) (explaining that a protective order is appropriate when the test is satisfied, but discovery should proceed "if either prong of the test is not met.").

Some district courts differ on whether to apply the "convinced" or "clear possibility" standard under the second prong. *See Wood,* 644 F.2d at 801 ("A

8

district court may…stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief."); *GTE Wireless, Inc. v. Qualcomm, Inc.,* 192 F.R.D. 284, 287 (S.D. Cal. 2000) (finding that defendant need demonstrate only a "clear possibility" that dispositive motion will be granted). In this case, it is not necessary to resolve whether the "convinced" or "clear possibility" standard applies, as Bridger cannot meet its burden under either.

## ARGUMENT

## I. Bridger Cannot Demonstrate Good Cause For Staying Discovery, As There Is No "Clear Possibility" That Its Forthcoming Motion To Dismiss Will Be Granted.

There is no "clear possibility" that Bridger's forthcoming motion to dismiss will be granted, and therefore no good cause to stay discovery. In this response, the United States describes what it anticipates will be the key points of its opposition to Bridger's motion to dismiss. While the opposition will surely include a deeper analysis of the issues raised by Bridger, the points here are sufficient to show that there is no clear possibility that Bridger's forthcoming motion will be granted.

### A. The First Cause of Action is Not Barred by Bridger's 2016 Settlement with the State of Montana.

Bridger contends that the first cause of action – which seeks civil penalties for Bridger's violation of Section 311(b) of the Clean Water Act – is barred by CWA Section 309 (g)(6)(A)(iii) as a result of its payment of a penalty to the state of Montana. Not so.

9

Section 309(g) authorizes EPA to assess administrative penalties for certain types of violations of the Clean Water Act and sets forth procedures for assessing these penalties. The pursuit of administrative penalties pursuant to Section 309(g) will generally bar a subsequent citizen suit for the same violations. *See* CWA Section 309(g)(6)(A), 33 U.S.C. § 1319(g)(6)(A). Under certain circumstances, the payment of a state administrative penalty will also bar a subsequent Clean Water Act penalty action by the federal government for the same violation. These circumstances, however, are limited to where the penalty is assessed under a "comparable State law." CWA Section 309(g)(6)(A)(iii), 33 U.S.C. § 1319(g)(6)(A)(iii).

Section 309 (g)(6)(A)(iii) bars subsequent federal action only where the state penalty is assessed under a <u>specific</u> provision of state law comparable to CWA Section 309(g); the relevant inquiry is whether the specific state administrative penalty provision is comparable, not the overall statutory scheme. *Citizens for a Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111, 1118 (9th Cir. 1996), *cert. denied*, 519 U.S. 1101 (1997) ("*Unocal*"). Most courts assess comparability by comparing the (1) penalty assessment criteria, (2) public participation procedures, and (3) right to judicial review in the state law with those same criteria in CWA Section 309(g). *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1254-6 (11th Cir. 2003); *see also Save Our Beaches & Bays v. City and Cty.*

10

*of Honolulu*, 904 F. Supp. 1098, 1132 (D. Haw. 1994) (holding that a state law "must safeguard public participation rights to be considered 'comparable' to [Section 309(g)]"); *Waste Action Project v. Atlas Foundry & Mach. Co.*, 1998 WL 210846, at *6 (D. Wash. 1998) (noting that Ninth Circuit cases have a "restrictive view" of when Section 309(g)(6) operates as a bar). If the specific state law under which the penalty was assessed and CWA Section 309(g) are not comparable with respect to any one of these criteria, the state law is not a "comparable State law" for purposes of the bar in Section 309(g)(6)(A). *McAbee*, 318 F.3d at 1256.

Here, according to the state settlement agreement, the penalty paid by Bridger was assessed pursuant to Sections 75-5-611 <u>and</u> 75-5-631 of the Montana Water Quality Act ("MWQA"). ECF No. 23-5 at ⁋ 59. While Section 75-5-611 is at least an administrative penalty provision, Section 75-5-631 is a <u>judicial</u> penalty provision and therefore patently not comparable to the administrative penalty provisions in CWA Section 309(g). *See Unocal*, 83 F.3d at 1118. The state penalty agreement likely references both sections because Section 75-5-611 alone would not have authorized the penalty assessed.[2] The fact that the penalty exceeded the maximum amount authorized by MWQA Section 75-5-611 is proof that the penalty could not have been assessed under MWQA Section 75-5-611 – the only

---

[2] *See* Mont. Code Ann. § 75-5-611(9)(a) (capping administrative penalties under Section 75-5-611 at "$100,000 for any related series of violations").

potentially comparable state law here.

But even if the penalty were assessed pursuant to MWQA Section 75-5-611, in contravention of the penalty cap, Section 75-5-611 is not a "comparable State law" for purposes of CWA Section 309(g)(6)(A). Ninth Circuit courts have focused in particular on the comparability of public participation provisions, *see Save Our Beaches & Bays*, 904 F. Supp. at 1132, and there are clear differences between the public participation guarantees in CWA Section 309:

| CWA Section 309(g) | MWQA Section 75-5-611 |
|---|---|
| Public notice and an opportunity to comment prior to penalty assessment. 33 U.S.C. § 1319(g)(4)(A). | <u>No</u> required public notice or opportunity to comment. *See* Mont. Code Ann. § 75-5-611.[3] |
| Public right to present evidence if a hearing is held. 33 U.S.C. § 1319(g)(4)(B). | <u>No</u> public right to present evidence if a hearing is held. *See* Mont. Code Ann. § 75-5-611. |
| Public right to petition for a hearing if one is not held. 33 U.S.C. § 1319(g)(4)(C). | <u>No</u> public right to petition for a hearing if one is not held. Only the alleged violator may request a hearing if not required by DEQ. Mont. Code Ann. § 75-5-611(4). |

---

[3] The state settlement agreement was, in fact, made available for public comment, but only because it was required by the Montana Comprehensive Cleanup and Responsibility Act, Mont. Code Ann., §§ 75-10-723(2) and 75-10-713 (Ex. 23-5 at ¶ 93). The public comment requirements from a different statutory scheme are not relevant to assessing state law comparability under 309(g)(6)(A)(iii). *See Unocal*, 83 F.3d at 1118.

These differences alone require a finding that MWQA Section 75-5-611 is not a "comparable State law" for purposes of the bar in Section 309(g)(6)(A). Therefore, the state penalty paid by Bridger, even if it were assessed under MWQA Section 75-5-611, does not bar this federal enforcement action.[4]

### B.    The Complaint Satisfies The Pleading Requirements In Rule 8 Of The Federal Rules Of Civil Procedure.

Bridger argues that the Government has failed to plead sufficient facts to support its requests for injunctive relief and, therefore, has failed to satisfy the pleading requirements in Rule 8. Bridger's Motion at 21. This argument confuses the requirements in Rule 8(a)(2) applicable to a "claim for relief" with the requirement in Rule 8(a)(3) that the complaint contain "a demand for the relief sought." To be sure, a claim for relief must be supported by "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, there is no question that the Amended Complaint includes sufficient facts to state claims against Bridger for violations of both Section 301(a) of the Clean Water Act and the federal pipeline safety regulations in connection with the Yellowstone spill.

As a consequence of Bridger's violation of Section 301(a) (the claim for

---

[4] That is not to say that Bridger's payment of a state penalty is irrelevant. In assessing a penalty for Bridger's violation of CWA Section 311(b), the Court must consider, among other things, "any other penalty for the same incident." 33 U.S.C. § 1321(b)(8).

relief), Bridger is liable for "appropriate relief, including a permanent or temporary injunction … to restrain such violation and to require compliance" (the demand for relief). 33 U.S.C. § 1319(b). As a consequence of Bridger's violation of the federal pipeline safety regulations (the claim for relief), Bridger is liable for "appropriate relief, including a temporary or permanent injunction" (the demand for relief). 49 U.S.C. § 60120(a). *See Fauley v. Wash. Mut. Bank, FA,* 2014 WL 1217852, at *9 (D. Or. Mar. 21, 2014) (recognizing that plaintiff's "'claim for injunctive relief' is actually a prayer for relief which the court may consider only after adjudicating her substantive causes of action"); *Curtis v. Option One Mortg. Corp.,* 2010 WL 1729770, at *8 (E.D. Cal. Apr. 28, 2010) ("Under Federal law, an injunction is a remedy to another claim or cause of action and not a claim or cause of action in and of itself."); *United States v. Citgo Petroleum Corp.,* 697 F. Supp. 2d 670, 672 (W.D. La. 2010) (noting "that [CWA] Section 301(a) is a predicate for the injunctive relief sought by Plaintiffs. However, the need for and nature of injunctive relief is reserved for determination after trial on the merits.").

None of the cases cited in Bridger's Motion is on point. The Government here is seeking to enforce the Clean Water Act and the federal pipeline safety regulations. The Amended Complaint contains sufficient facts to state a violation of Section 301(a) of the Clean Water Act and violations of the federal pipeline safety regulations. As long as a plausible claim for relief is pled, Rule 8(a)(3)

14

simply requires that a complaint also include a demand for the relief sought. The

Amended Complaint thus fully satisfies the requirements of Rule 8.

### C. The Portion Of The Third Cause Of Action Seeking Civil Penalties And Punitive Damages Is Not Barred By The Statute Of Limitations Because Bridger's Violation Of The Federal Pipeline Safety Regulations Was A "Continuing Violation."

Finally, Bridger argues that the claim for civil penalties and punitive

damages in the Third Cause of Action is barred by the applicable five-year statute

of limitations in 28 U.S.C. § 2462. While it is true that Bridger should have taken

measures to prevent the failure of the Poplar Pipeline beginning in 2011 or early

2012, when it either knew or should have known about the significant risk to the

integrity of the Poplar Pipeline at the Yellowstone Crossing from river scour, this

was a <u>continuing</u> obligation.[5] Therefore, each day that Bridger operated the Poplar

Pipeline without taking adequate measures to prevent a failure of the pipeline – up

to and including January 17, 2015 (the day of the Yellowstone spill) – constituted a

new and discrete violation of PHMSA's regulations, subject to a new statute of

limitations. *See* 49 U.S.C. § 60122(a) ("A person that … has violated … a

regulation prescribed … under this chapter is liable to the United States

---

[5] By statute, Bridger was required to have an "integrity management program," which included, at a minimum, "[a] method for conducting an analysis on a <u>continuing basis</u> that integrates all available information about the integrity of the facility and the consequences of releases from the facility." 49 U.S.C. § 60109(c)(3)(D) (emphasis added).

Government for a civil penalty of not more than $200,000 for each violation. <u>A separate violation occurs for each day the violation continues</u>. The maximum civil penalty under this paragraph for a related series of violations is $2,000,000") (emphasis added);[6] *see also ExxonMobil Pipeline Co. v. United States Dep't of Transportation*, 867 F.3d 564, 582 (5th Cir. 2017) (finding that each day a violation of 49 C.F.R. §§ 195.452(b)(5), (h)(1), and (h)(2) occurred was a separate violation subject to the $2,000,000 statutory maximum). Because each day Bridger's violation continued was a separate violation, the Government's claims for civil penalties and punitive damages in the Third Cause of Action for violations on and after January 1, 2015 are within the five-year statute of limitations.[7]

## II.   The Government Should Be Allowed To Take Discovery On The Applicability Of The Equitable Tolling Doctrine.

The five-year statute of limitations applicable to the penalty and punitive damages claims asserted in the Third Cause of Action can be equitably tolled where, among other things, a defendant conceals operative facts that are the basis of the cause of action. *See Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240

---

[6] These monetary caps do not apply in a judicial enforcement action, such as this one. *See* 49 U.S.C. § 60120(a)(1) (providing that "[t]he maximum amount of civil penalties for administrative enforcement actions under Section 60122 shall not apply to enforcement actions under this section").

[7] The Parties entered into a tolling agreement, which tolled the statute of limitations beginning January 1, 2020.

(9th Cir. 1996). Here, there are indications that Bridger concealed from PHMSA (and later EPA) material information about the condition of the Yellowstone Crossing before the Yellowstone spill, which forms the basis of the violations asserted in the Third Cause of Action.

In particular, Bridger had a "depth of cover survey" done at the Yellowstone Crossing by a third-party (Central States Underwater Contracting, Inc.) in September 2011 ("the 2011 survey"). Bridger received a report of the 2011 survey from Central States, which it was required to provide to PHMSA. *See* PHMSA's December 13, 2011 request for information, attached as Exhibit 1. A copy of Bridger's response to PHMSA's request for information, which includes the "final" 2011 survey report at US_RFA000020-26, is attached as Exhibit 2.[8]

Bridger clearly had doubts about the reliability of the 2011 survey because seven months later, in April 2012, it had a second depth of cover survey done at the Yellowstone Crossing ("the 2012 survey").[9] A copy of the 2012 survey is attached as Exhibit 3.

It appears that following the 2012 survey, Central States prepared a new

---

[8] It is currently unknown whether Bridger made any changes to the 2011 survey report before it provided it to PHMSA.

[9] The last survey at the Yellowstone Crossing before the 2011 survey was done 10 years earlier, in 2001. There were no other surveys done at the Yellowstone Crossing following the 2012 survey before the Yellowstone spill.

report of the 2011 survey (the "new 2011 survey report"). A copy of the new 2011 survey report is attached as Exhibit 4. The new 2011 survey report is rife with inconsistencies. For example, it includes a "note" indicating that there is only 1 ½ feet of cover over the pipeline. Ex. 4 at US_RFA000003. This conflicts with a separate statement in the new 2011 survey report that the minimum depth of cover at the time of the survey was 7.9 feet. *Id.*

The new 2011 survey report includes a drawing of the channel profile and the top of the pipeline. Ex. 4 at US_RFA000005. According to the drawing, the minimum depth of cover is about 5 feet (at about "2+50" or about 250' from boundary marker #1 on the left side of the drawing), with a stated 10% margin of error. *Id.* Thus, the new 2011 survey report contains internally conflicting information indicating that the minimum depth of cover over the Poplar Pipeline at the Yellowstone Crossing was 1.5 feet, approximately 5 feet, and 7.9 feet. It is currently unknown what, if anything, Bridger did to try to resolve these inconsistencies.

The 2012 survey is similarly problematic. While the summary states there was a minimum depth of cover of 7.9 feet (Ex. 3 at US_RFA000031), the drawing of the channel profile and the top of the pipeline appears to be identical to the drawing attached to the new 2011 survey report. Compare Ex. 3 (2012 survey report) at US_RFA000031 with Ex. 4 (new 2011 survey report) at US_RFA000005

18

(other than the date, the drawings appear identical). As noted above, the drawing

shows a minimum depth of cover of about 5 feet, which is at odds with the 7.9 feet

reported in the summary. Moreover, it appears that the location of the pipeline

within the 500-foot-wide channel is based on only three data points (only one of

which is within the channel itself). It is currently unknown what, if anything,

Bridger did to try to resolve conflicts within, and ensure the reliability of, the 2012

survey.

Despite having the information in the new 2011 survey report (indicating a

minimum depth of cover of 1.5 feet), as well as knowledge that the 2012 survey

data "just doesn't make sense,"[10] Bridger never corrected the representations it

made in early 2012 to PHMSA. In fact, Bridger repeated these false and/or

misleading claims, including the false claim that both the 2011 and 2012 surveys

found the minimum depth of cover at the crossing to be 7.9 feet. *See* CAO

Documentation Report submitted to PHMSA on November 15, 2016 (attached as

Exhibit 6) at Section 3.2 (stating that both the 2011 and 2012 surveys "found the

minimum depth of cover at the crossing to be 7.9 feet"); Accident Report, dated

August 1, 2016 (attached as Exhibit 7) at Part H (claiming that the 2011 and 2012

---

[10] *See* email string between Tyler Reece (Bridger's Assistant Director of Engineering), Jared Radosevich (Bridger's Pipeline Compliance Coordinator), and Trent Nedens (General Manager – Midwest Division, Ballard Marine Construction), attached as Exhibit 5, at BRIDGER00054398-54400.

surveys "both indicated adequate cover over the pipeline crossing"). Bridger also repeated this misinformation to EPA on May 29, 2015. *See* Bridger's Response to EPA's March 26, 2015 request for information, Request No. 17 (attached as Exhibit 8) at 21-22 (repeating the false/misleading statements from Bridger's response to PHMSA's request for information (Exhibit 2 at US_RFA000012), including that the response provided the "final" survey report, that "[d]epth of cover surveys have continued to show adequate depth of cover," and that the river bottom at the crossing is "rocky.").

At a minimum, this raises questions – which Bridger has yet to answer – about whether Bridger concealed material facts about the condition of the crossing before the Yellowstone spill. The condition of the crossing is one of the factors that determines risk to the pipeline, which, in turn, informs the measures that must be taken to prevent a failure of the pipeline, the subject of the Third Cause of Action. Given these questions, the Government should be allowed to take discovery related to the applicability of the equitable tolling doctrine to its Third Cause of Action.

## CONCLUSION

The Government does not oppose Defendant's request to defer the Rule 26(f) conference and related deadlines until Defendant's forthcoming motion to dismiss is decided. The Government does, however, object to staying discovery. Defendant has not demonstrated good cause for a protective order based on the

filing of a potentially dispositive motion. Defendant's planned motion is not well founded and, therefore, there is no "clear possibility" it will be granted. Moreover, the ultimate resolution of a portion of Defendant's argument – concerning the application of the statute of limitation to the penalty claims in the Third Cause of Action – potentially implicates the equitable tolling doctrine, which requires additional discovery. Accordingly, Defendant's motion for protective order staying discovery should be denied.

Respectfully submitted,

LEIF M. JOHNSON
United States Attorney

MARK S. SMITH
Assistant United States Attorney

/s/ *Mark C. Elmer*
MARK C. ELMER
United States Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1352 | Fax: (303) 844-1350
mark.elmer@usdoj.gov

*Attorneys for the United States of America*

21

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(d)(2)(E), I certify that this response is limited to 4,916 words, excluding the caption, table of contents and authorities, signature block and certificate of compliance, printed in at least 14 point font and double spaced, except for footnotes and indented quotations.

<u>/s/ Mark C. Elmer</u>
U.S. Department of Justice
Counsel for the United States